Good morning, Counsel. Good morning, Your Honor. Greg Weston and my colleague Andrew Hamilton for Plaintiff Appellant Shavonda Hawkins. We have a few different tiers of arguments here. I'd like to start with our preferred argument and the one, of course, we think is most correct, which is there's no actual preemption issue involved here because we allege a violation of federal law that concurrently also violates state law. And it's the state law, the unfair competition law, that gives us standing to prosecute the violation of both the state and federal law. Counsel, I know we'll get to this eventually, so I'll start right off with it. Based upon what Congress did recently and as well as the FTA's own determination, they say that the PHOs are not illegal, they're fully compliant until June 18th of this year. Why are you coming at this now while it's still legal pursuant to both the congressional statute and the FDA's own determination? Well, it's not legal, and I'd like to explain why. It is a matter of enforcement discretion. It's not legal to drive 66 in a 65 zone. You're not likely to be pulled over, you almost certainly are not. But that doesn't mean that it is legal to do so. Same thing with federal marijuana statutes. Counsel, you're mixing apples and oranges there. This is an agency that's designed to determine when something is unlawful and cannot be distributed or used. They made a determination that they were going to give people a chance to get rid of these trans fats over time, over three years, to get rid of their inventories and so on. That's not a 65, 66 mile an hour analogy. They're simply saying we've made a determination that going forward, this is probably good to just phase these out. That's what we're going to do. You're suggesting that notwithstanding what the Congress said and notwithstanding what the FDA said, that we're going to treat this as being instantly, immediately illegal. I don't see it. What am I missing? Well, I think what you're missing is it is not the FDA that determines directly whether or not a substance is legal to use. FDA determines whether or not a substance is generally recognized as safe. And what it said in its 2015 order was PHO are not grass for any use in human food. It is Congress that has and indeed did determine that food additives that are not grass are unlawful to use. The FDA simply lacks the authority to say you can use it. What it can do is say we're not going to enforce this particular bit of it, and FDA has a great deal of prosecutorial discretion, and I am in no way challenging the FDA's prosecutorial discretion. But the reason, but the purpose behind the non-enforcement in the three-year time lag in part is to give breathing space to the industry to develop alternatives and to make the adjustments, et cetera, et cetera. So why doesn't a state law that allows immediate enforcement prior to the expiration of a three-year period, why doesn't it obstruct the purpose of both the FDA and Congress in codifying that in the CAA? Well, the FDA actually addressed that issue in its 2015 order. And what the FDA said is we know of no express provision that would preempt state law limiting or even prohibiting PHO in food. And nor do we believe it's likely that it would frustrate any federal objective. Now, the FDA should be given deference in its conclusion that there's no obstruction of any federal objective. Okay. What about Congress's passing of the CAA? Well, Congress's passing of the CAA speaks not one bit about federal, one bit about state law or the states or preemption. And what's interesting is no nod in that piece of legislation towards allowing the possible coexistence of state prohibitions, as it was in the FDA final determination. Well, the standard on preemption is that it needs to be the unmistakable intent of Congress, when it's an area of concurrent state and federal regulation, as food safety does. And in this case, the federal government more or less affirmed, it made a statute, the FDA's decision to do this, but the FDA did not say that the PHO is grass. It said you shall not deem foods who use PHO adulterated. And the language of it supports an interpretation that it is binding on the secretary of HHS, which is how it regulates the FDA. And there is, again, no limitation. They knew the FDA. They explicitly refer back to the FDA's final determination in the rider. And nonetheless, with that statement that there's no preemption, that the FDA does not believe there's any preemption, they nonetheless did not say state law is preempted. And what's amazing is in the same law, the CAA of 2016, Section 108, there's an express preemption clause. And Congress put in an express preemption clause that says header preemption, and it says exactly what state law is in there. But looking at this, how one state laws existed prior to this final determination, is it prevalent to have state, are there other states other than California, which already had some statutes restricting trans fats? Is this a common occurrence? Is it well known that the states were already in the field of regulating? The FDA spent more than two years on its 2015 regulation and reviewed hundreds of comments, and its docket for this particular food additive petition had thousands of entries. And many, many scientific papers were made by the FDA. So it was fully aware that there were many different regulations, and they definitely exist outside of California. Are there other regulations that already existed? Yes. In fact, there is a city regulation where my co-counsel is located in Cleveland that says that trans fat may not be used in any way in restaurants. And California has it for schools. That's very explicit. However, we, you know, to get back to my other point, my secondary point, I guess, is even if they are allowed under Federal law because of the 2015, because of the CAA, most of our class period predates it. The state of regulation before the 2015 final determination and then later the CAA was you had two options. You could file a food additive petition or you could determine on your own whether or not trans fat was generally recognized as safe. In this case, the defendant did not try to make that determination on its own. We allege the defendant did not make that determination on its own, and that allegation has to be taken as true. If it had done so, if it had looked into in 2008 when the class period begins, whether or not trans fat was generally accepted as safe, it would have determined that it's not. And because of that, it violated both state and Federal law. This was the state of scientific knowledge in 2008 or thereabouts. In 2006, an author from Harvard Medical School published in the New England Journal of Medicine the following. The evidence and magnitude for adverse health effects are far stronger on average than food contaminants and pesticide residue. This is what Julie Louise Gerberding, who was President Bush's head of the CDC, published in 2009, one year into the class period. They are certainly harmful. Their obligation was to ensure that there was a scientific consensus of safety. One year into the class period, we have a publication. These are certainly helpful by one of our highest-ranking doctors in government. And even going back to the question, I'm curious, were there any cases pre-2015 determination holding that state regulation was preempted? Almost every case that looks at differing levels of Federal and state food regulation find the state law is not preempted. I'll give you a few examples. The first one from the Supreme Court was Florida lime and avocado growers versus Paul. And that involved a California regulation that was stronger than the Federal one over maturity standards for olives. California imposed additional element of a minimum oil percentage. I'm familiar with that. I'm talking about PHOs in particular. You said there was prevalent state regulations restrictions predating. I'm wondering whether any preemption action had ever been brought against any of those. No. No one has tried to go there either way. But if I could mention just another case that only came out. You're up to you, but you're down to one minute. Yes, that's a good idea. Thank you. I'll bet you disagree with him. Good morning. Thank you. Andrew Cox, I'm here for Advanced PR Foods, and we'd ask that this Court affirm the lower court's dismissal of Ms. Hawkins' complaint. But we've also filed a motion for sanctions because we believe following the Consolidated Appropriations Act of 2016, that rider that refers to the PHOs, Ms. Hawkins and Mr. Weston's theory, their case theory, has been rejected. Let me suggest something to you, Counselor. You can talk about sanctions all you want, but I think from this panel you're not going to get sanctions. We're interested in your view of the law. Absolutely, Your Honor. Prior to June 2015, and let me take a step back because I want to clarify, this is purely a use claim. There's no allegation that there was anything mislabeled on Advanced PR's product. There's no allegation of any erroneous or false representation of fact that Ms. Hawkins relied upon. There's no allegation of fraud or advertisements that were misleading in any way. This is purely a use claim. The claim is that it is unlawful to use PHOs. Prior to June 2015, as reflected in the FDA's ---- Well, it's unlawful under the State law. But prior to June 2015, Your Honor, PHOs were generally recognized as safe, which means it is lawful under Federal law to sell them. A State law that would conflict with that would be preempted. So do you concede that there were State laws preexisting the 2015 determination that attempted to restrict or prohibit PHOs? None that would ---- Those are time and place statutes, Your Honor. And they apply to retailers in certain contexts. None that apply to manufacturers that I'm aware of. The ones that have been cited in the complaints here are prohibitions against selling certain foods in schools and at retail establishments. Not a prohibition. But why wouldn't those be preempted? Well, because the FDA deals with what manufacturers can put in their food products. I think there is a small spot for States to say where you can and cannot sell certain products. You mean it's just a time, place and manner exception to preemption? Well, no. I would say that that's not a direct conflict. Well, where the Federal Government hasn't acted. Exactly. Exactly. So, for example, let's put it into the context of this case. Ms. Hawkins alleged that she goes into a dollar store to buy prepackaged microwavable sandwiches. The California school regulation does not apply. The restaurant regulation does not apply. It doesn't apply for a variety of reasons. First of all, the product is prepackaged, which means it's labeled. Those two regulations don't apply to prepackaged food, because what the State of California is concerned with is food that isn't labeled in accordance with FDA regulations. So those regulations are doing other things. If the State of California were to endorse a theory that made it unlawful to sell foods containing partially hydrogenated oils, which is exactly what Ms. Hawkins and Mr. Weston are seeking to do, that would be a direct conflict with Federal law. And it would frustrate the purpose of the FDA's final determination. So what does it mean when the FDA says in its final words that it believes that State and local laws that prohibit or limit the use are not likely, not even could or might, this is not likely to be in conflict or frustrate Federal objectives? What are we to make of that? That paragraph begins with a statement that the FDA is not taking a position on this. If a State law were to directly conflict with the FDA's objectives, it would be preempted. And then it finishes with that sentence. And the way I would read that, Your Honor ---- What's an example of a local or State law that would prohibit the use of PHOs in food that would not be in conflict? And the only thing I can even imagine is that they are thinking of these time and place type regulations, like you cannot sell unpackaged food in schools that contains trans fat. That's the only way I can reconcile that, Your Honor. What do you do with opposing counsel's argument that in the CAA there were certain other additives, chemicals, that were an express congressional determination of preemption? There was none here, there was no evidence from his perspective that there was an intent to preempt these contrary State laws. What role should that play in our analysis? I think that the intent from the CAA is clearly to proclaim that his case theory is wrong. The intent of the CAA is to very clearly state, in direct contrast to what they're alleging and still contending on this appeal, that PHOs are not to be deemed unsafe and food containing PHOs are not to be deemed adulterated within the context of the FDA statutes and regulations. And that's exactly the theory that they're continuing to advance. Well, it's interesting because the CAA says shall not be deemed unsafe within the meaning of Section 409A, et cetera, et cetera. Obviously it should not be deemed by the FDA. No, Your Honor. Who else could deem it unsafe within the meaning of 409? Litigants, Your Honor. If you look at the legislative history, they say expressly the purpose of that rider is to put an end to these frivolous lawsuits. That's in the legislative history. That is the purpose for the CAA. They put that into writing to put an end to these. Well, it doesn't say shall be deemed unsafe within the meaning of 409 or any state law or any law whatsoever. It just says 409 or 402A1. That's precisely Ms. Hawkins' theory, though, is that because it's no longer generally recognized as safe, it is therefore an adulterant or, sorry, not an adulterant, an additive, and because it's an additive, it's unsafe and food with it is adulterated. That's the case theory. It's trying to invoke that exact claim that Congress rejected in the CAA. But the CAA could have been written, as other portions of it were, to say that during this period until June, whatever it was, of this year, that any state law that would purport to rule otherwise is hereby preempted, something to that effect. They could have done that. They didn't do it. So what's the implication of the preemption? Well, we're not advancing an express preemption argument. It's implied preemption. It's a conflict. So it's implied, and the implication from your perspective comes from the CAA or from what the FDA did or the fact that they're, what should we, where do we find the implied intent? So the implied preemption is coming from two sources. First off, the FDA's final determination. And the FDA has the express authority to determine how you can use generally recognized as safe components and additives in food. They have that authority. And in 2015, they determined that you can use them up until 2018. After that, you either need to stop using them or you need to apply for a special approval. So to start with, that, and the FDA had very clear objectives they wanted to achieve by allowing that three-year period. So a claim that makes it... Well, those were primarily commercial reasons, it seems to me. You want to be able to clear out their shelves and so on and so on. But the reality is that either the PHOs are harmful or they're not harmful. The FDA made a determination that at least by the end of 2018, we're not going to use these anymore unless you get a special permit to do that. Their argument, I take it, is that, hey, even though there was a commercial delay, in effect, it really doesn't matter in terms of whether these are harmful or not. And the Congress didn't expressly say that you couldn't make a determination to the contrary. Well, under the Food, Drug and Cosmetic Act, it's the FDA, as the Delegate of the Secretary, that is responsible for determining what is safe for our food. It's their responsibility. So state laws that would take that away from the FDA would be conflicted and preempted. So the FDA here determined at the very least it's safe to continue to use partially hydrogenated oils until June 2018. They considered... Well, it's the same stuff, though. You know, they say it's no longer regarded as safe, but it's still the same product. And so you are trying to say that it's safe up until this time as a scientific matter. I don't think you can do that. I'm sorry, I didn't mean to say that. I'm not making that argument. I'm saying that it's the FDA's responsibility to determine what we can put in our food, and they determined that you can continue to do this until June 2018. And I want to clarify, the FDA's determination that partially hydrogenated oils no longer meet the definition of generally recognized as safe is not a determination that they're unsafe. And they're very clear about that in their final determination. They state that. There was a comment saying that you can't take it off the list until, or you can't deem it not grass until you find it unsafe, and the FDA said no. We do not have to find it unsafe to determine that it doesn't meet this standard of generally recognized as safe. They're suing under rather general state laws that talk about unlawful, unfair, harmful. And they're saying that up until the time that the FDA says that it's no longer okay under federal law to use these products, that the state law still applies. I mean, that's kind of the best I can do with that, with the way that they're saying it. And it has a certain appeal. Well, the reason that argument is wrong is because prior to June 2015, PHOs were generally recognized as safe in the industry. That means you can lawfully use them in food, and if you can do that, a state law claim that says the opposite would be a conflict and a preemption. It would be preempted. So that's why they're wrong. And the reason that argument is wrong is because prior to June 2015, PHOs were generally recognized as safe. So they could never have brought this to action under state law. Yeah, that's right. Okay. Any other questions about my colleagues? Thank you for your argument. We have, Ellen has a brief rebuttal time. Thank you. The only nonpartisan bit of legislative history here is from the Congressional Research Service. I'll just read it in full, because it's only one sentence. Prohibits the FDA from deeming partially hydrogenated oils to be safe, or any food containing partially hydrogenated oil to be adulterated prior to 2018. And what that really, I think, goes to is we don't have the burden of persuasion on preemption. They do. And their burden is pretty high. They need to show the CAA had the unmistakable intent of Congress to preempt. And I think that's just not here. Going back to another point that was made by defense was that the FDA said PHO was grass until 2015. That's absolutely false. Nothing in the final determination said that. And there was actually a list of all the substances considered grass that the FDA had maintained. Some sui sponte, some in response to food additive petitions. It doesn't appear on that. There were two particular types that were not at issue here. One of them involves a partially hydrogenated fish oil, just not used here. Counsel, I apologize, but your time is up, so we thank you for your argument to both sides. The case just argued is submitted. Thank you, Your Honors.
judges: Schroeder, M. Smith, Chen